-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 Bnr3iTAZLTEIXOLleTkTlHksRRzuM04Romc71MTh3Z8K9cFRsVSZVGH76P1VXvpV
 igICA8cUGx67eQ+VtM8Aag==

<SEC-DOCUMENT>0000793524-11-000010.txt : 20110209
<SEC-HEADER>0000793524-11-000010.hdr.sgml : 20110209
<ACCEPTANCE-DATETIME>20110209133455
ACCESSION NUMBER:		0000793524-11-000010
CONFORMED SUBMISSION TYPE:	8-K
PUBLIC DOCUMENT COUNT:		3
CONFORMED PERIOD OF REPORT:	20110207
ITEM INFORMATION:		Entry into a Material Definitive Agreement
FILED AS OF DATE:		20110209
DATE AS OF CHANGE:		20110209

FILER:

	COMPANY DATA:
		COMPANY CONFORMED NAME:			RESEARCH FRONTIERS INC
		CENTRAL INDEX KEY:			0000793524
		STANDARD INDUSTRIAL CLASSIFICATION:	PATENT OWNERS & LESSORS
[6794]
		IRS NUMBER:				112103466
		STATE OF INCORPORATION:			DE
		FISCAL YEAR END:			1231

	FILING VALUES:
		FORM TYPE:		8-K
		SEC ACT:		1934 Act
		SEC FILE NUMBER:	001-09399
		FILM NUMBER:		11586008

	BUSINESS ADDRESS:
		STREET 1:		240 CROSSWAYS PARK DR
		CITY:			WOODBURY
		STATE:			NY
		ZIP:			11797-2033
		BUSINESS PHONE:		5163641902

```
         MAIL ADDRESS:
               STREET 1:              240 CROSSWAYS PARK DR
               CITY:                  WOODBURY
               STATE:                 NY
               ZIP:                   11797-2033
</SEC-HEADER>
<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>form8krfi020911.txt
<DESCRIPTION>RESEARCH FRONTIERS CURRENT REPORT ON FORM 8-K DATED FEBRUARY 9, 2011
<TEXT>
```

==================================================================

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

----------------------

FORM 8-K

----------------------

CURRENT REPORT

PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): February 7, 2011

----------------------

RESEARCH FRONTIERS INCORPORATED
(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

| DELAWARE | 1-9399 | 11-2103466 |
|---|---|---|
| (STATE OR OTHER JURISDICTION OF INCORPORATION) | (COMMISSION FILE NUMBER) | (IRS EMPLOYER IDENTIFICATION NO.) |

240 CROSSWAYS PARK DRIVE
WOODBURY, NEW YORK 11797-2033
(ADDRESS OF PRINCIPAL EXECUTIVE OFFICES AND ZIP CODE)

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (516) 364-1902

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR

230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

================================================================

Item 1.01. Entry into a Material Definitive Agreement.


On February 7, 2011 Research Frontiers announced that its SPD-Smart light-control technology was selected by Daimler AG for use in its Mercedes-Benz SLK roadster as part of its Magic Sky control option. It was also disclosed in that press release that Research Frontiers and its licensee SPD Control Systems jointly licensed their electronics patents to Daimler for their use in controlling the SPD-SmartGlass in the Mercedes-Benz SLK and other vehicles. On February 8, 2011, SPD Control Systems issued the Newsletter with additional information which Newsletter is attached to this Report as an exhibit.

Research Frontiers press release is available on the Company's website at http://www.SmartGlass.com.

The press release may include statements that may constitute "forward-looking" statements as referenced in the Private Securities Litigation Reform Act of 1995. Those statements usually contain words such as "believe", "estimate", "project", "intend", "expect", or similar expressions. Any forward-looking statements are made by the Company in good faith, pursuant to the safe-harbor provisions of the Act. These forward-looking statements reflect management's current views and projections regarding economic conditions, industry environments and Company performance. Factors, which could significantly change results, include but are not limited to: sales performance, expense levels, competitive activity, interest rates, changes in the Company's financial condition and several business factors. Additional information regarding these and other factors may be included in the Company's quarterly 10-Q and 10K filings and other public documents, copies of which are available from the Company on request. By making these forward-looking statements, the Company undertakes no obligation to update these statements for revisions or changes after the date of the press release.

The information in the press release and newsletter shall not
be  deemed "filed" for purposes of Section 18 of the
Securities Exchange Act of  1934, nor shall they be deemed
incorporated by reference in any filing
under the  Securities Act of 1933, except as shall be expressly
set forth by specific reference in such filing.


Item 9.01. Financial Statements and Exhibits.

(c)  Exhibits.

10.55 License Agreement effective as of December 22, 2010 between
Daimler AG, Research Frontiers Incorporated and SPD Control
Systems Corp. filed herewith with portions of this document
omitted pursuant to the Registrant's request for confidential
treatment and filed separately with the Securities and Exchange
Commission, and incorporated herein by reference.

99.1 SPD Control Systems Newsletter dated February 8, 2011.

SIGNATURES

     Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned hereunto duly authorized.

                              RESEARCH FRONTIERS INCORPORATED


Dated: February 9, 2011


                              /s/ Joseph M. Harary
                              ---------------------------
                              By: Joseph M. Harary
                              Title: President and CEO
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10
<SEQUENCE>2
<FILENAME>ex1055.txt
<DESCRIPTION>SPD ELECTRONICS PATENT LICENSE AGREEMENT BETWEEN DAIMLER AG, RESEARCH
FRONTIERS AND SPD CONTROL SYSTEMS.
<TEXT>
[EXHIBIT 10.55 - Certain portions of this document have been
omitted in the publicly filed version of this document  pursuant
to the Registrant's request for confidential treatment and filed
separately with the Securities and Exchange Commission.
Omitted confidential information is indicated in brackets

in this Exhibit.]


SPD ELECTRONICS PATENT LICENSE AGREEMENT
AMONG
RESEARCH FRONTIERS INCORPORATED
AND
SPD CONTROL SYSTEMS CORPORATION
AND
DAIMLER AG


This License Agreement ("Agreement") effective as of December 22, 2010 by and among RESEARCH FRONTIERS INCORPORATED, a Delaware corporation ("LICENSOR") and SPD CONTROL SYSTEMS CORPORATION, a New York corporation ("SCSC") and DAIMLER AG, a corporation formed under the laws of Germany - Mercedesstrasse 137, 70327 Stuttgart, Germany ("LICENSEE").

RECITALS

WHEREAS, LICENSOR has been engaged in research and development in the application of physicochemical concepts to Light Valves and Light Valve Control Units, including Light Valve Transportation Vehicle Window Products (as such capitalized terms are hereinafter defined) and of methods and apparatus relating to products incorporating such concepts; and is possessed of and can convey information, intellectual property, and know-how for such products and rights to manufacture, use and sell such products; and

WHEREAS, SCSC as a licensee of Research Frontiers Inc. has been engaged in research and development of electronic controllers to operate Light Valves including Light Valve Transportation Vehicle Window Products, and has and can convey information, intellectual property and know-how for such electronic controllers and rights to manufacture, use and sell such electronic controllers; and

WHEREAS, LICENSEE is interested in manufacturing or having manufactured for it by its suppliers for use or incorporation of Light Valve Control Units in its Transportation Vehicles; and

WHEREAS, LICENSEE desires to acquire from LICENSOR and SCSC, and LICENSOR and SCSC desire to grant to LICENSEE, licenses with respect to intellectual property rights of LICENSOR and SCSC for use on Light Valve Control Units;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows.

1        DEFINITIONS.

The following terms when used herein shall have the respective meanings set forth in this Article 1.

The "Effective Date" of this Agreement shall be the date which is the last date of formal execution of this Agreement by duly authorized representatives of the parties to this Agreement as indicated on the signature page of this Agreement.

"Licensed Territory" means countries with LICENSOR's intellectual property rights listed in Schedule A.

"Light Valve" means a variable light transmission device comprising: a cell including cell walls, containing or adapted to contain an activatable material, described hereinafter, such that a change in the optical characteristics of the activatable material affects the characteristics of light absorbed by, transmitted through and/or reflected from the cell; means incorporated in or on the cell, or separate therefrom for applying an electric or magnetic field to the activatable material within the cell; and coatings, (including, but not limited to, electrodes), spacers, seals, electrical and/or electronic components, and other elements incorporated in or on or combined with the cell.  The activatable material, which the cell contains or is adapted to contain, includes in it solid suspended particles, which when subjected to a suitable electric or magnetic field, orient to produce a change in the optical characteristics of the device, and may be in the form of a liquid suspension, gel, film or other material.

"Light Valve Control Unit" or "LVCU" means a device used to operate Light Valve Transportation Vehicle Window Products containing electronics, including but not limited to, circuit boards, controllers, software, connectors and wiring, but this definition shall not include the products themselves incorporating a Light Valve such as Light Valve Transportation Vehicle Window Products. The Light Valve Control Unit is subjected to at least one of the intellectual property rights listed in Schedule A.

"Light Valve Transportation Vehicle Window Product" means a Light Valve used or intended for use as a window (including sunroofs, vehicle roofs, roof panels, windshields, and side and rear window panes which are an integral part of the internal or external structure of such vehicle) whether the window is supplied as original equipment or a replacement

window pane, integrally incorporated in a Transportation
Vehicle of a type not primarily designed or primarily
intended for military use. The term "Light Valve
Transportation Vehicle Window Product" shall not include a
Light Valve used or intended for use as a sunvisor, but may
include Light Valves which are used or intended for use in
a non-military Transportation Vehicle as, or as part of, or
are laminated to, or the surface area of which is primarily
attached to, a window, sunroof or windshield.

The term "Transportation Vehicle" shall mean passenger cars,
recreational vehicles, trucks, buses, mobile cranes, trains,
boats, agricultural, construction and mining equipment, but
shall not include other types of vehicles such as aircraft,
space craft and space-stations.

"Intellectual Property" means all patents and patent
applications listed in Schedule A.

LICENSOR, LICENSEE and SCSC  each individually referred to
as a "Party" and collectively referred to as the "Parties".


 [Confidential Information Omitted and filed separately with the
Securities and Exchange Commission]


2       GRANT OF LICENSE.

       2.1  License.

(a)     SCSC hereby grants to LICENSOR a non-exclusive right
and license (including the right to grant sublicenses) to
sublicense to LICENSEE any invention claimed in (i) any of
the unexpired patents, in any country, now or hereafter listed
under "SCSC Intellectual Property" on Schedule A attached
hereto or (ii) unexpired patents which issue from pending
patent applications now or hereafter listed under "SCSC
Intellectual Property" on Schedule A, and any continuations,
continuations-in-part, divisions, reissues, reexaminations,
or extensions thereof.

(b)     LICENSOR hereby grants LICENSEE a non-exclusive
right and license to make, have made, use, distribute, offer,
lease, sell or otherwise dispose of any invention claimed in
(i) any of the unexpired patents, in any country, now or
hereafter listed on Schedule A attached hereto or (ii)
unexpired patents which issue from pending patent
applications, in any country, now or hereafter listed in
Schedule A, and any continuations, continuations-in-part,

divisions, reissues, reexaminations, or extensions thereof
for use or incorporation of Light Valve Control Units in
LICENSEE's Transportation Vehicles.

2.2    No Other Rights.  LICENSEE agrees that,
except for the specific licenses granted to it under
Section 2.1 hereof for use in Light Valve Control Units,
LICENSEE has not acquired any rights or licenses under
this Agreement to use Light Valves or any components thereof
made by or for LICENSEE pursuant to this Agreement.

3 ROYALTY PAYMENTS, CONSIDERATIONS, REPORTS AND RECORD-KEEPING.

3.1 Royalties and Reports on Net Sales.

(a)    During the term of this Agreement, LICENSEE agrees
to pay LICENSOR upon distribution of the vehicle a royalty
hereunder which shall be  [Confidential Information Omitted and
filed separately with the Securities and Exchange Commission]

(b)    The royalty plus the corresponding sales tax, are to
be paid by LICENSEE on a monthly basis and shall be due on or
before the last day of each month and shall cover production
made for the month prior. [Confidential Information Omitted
and filed separately with the Securities and Exchange
Commission]

(c)    The Parties shall take all measures in accordance
with domestic law and the Treaty on the Avoidance of Double
Taxation between the United States of America and Germany
("the Treaty") to ensure a reduction of or exemption from,
as the case may be, taxes which might become payable in
connection with this Agreement.

All sales taxes shall be borne by LICENSEE. All other
taxes of any kind whatsoever in connection with payments
made by LICENSEE and imposed on LICENSOR by the US tax
authorities shall be borne by LICENSOR and/or SCSC.
All taxes or duties of any kind whatsoever in connection
with payments made by LICENSEE and imposed or to be paid
in Germany shall be borne by LICENSEE. The preceding sentence
does not apply to income taxes imposed or withheld in
accordance with the Treaty.

In case LICENSEE is required to withhold taxes in
accordance with the Treaty from the payments under this
Agreement, LICENSEE shall exercise its best effort to
attain that the payment to LICENSOR will be taxed at the

reduced rate under German tax law and the Treaty at the time of payment.

In case LICENSEE is required to withhold taxes from payments under this Agreement, LICENSEE shall provide LICENSOR with original copies of the tax receipt and any other documents that evidence calculation and payment of the tax without undue delay. These documents shall specify LICENSOR as tax payer, the amount of the tax paid, the tax law and the regulation on which such tax payment is based, the tax rate or the amount on which such rate is based, and the date of payment of the tax.

3.2     Minimum Royalties

Regardless of whether LICENSEE is distributing, purchasing or selling any Light Valve Control Units, during the term of this Agreement LICENSEE agrees to pay LICENSOR an initial fee of [Confidential Information Omitted and filed separately with the Securities and Exchange Commission] EUR after full signing of this License Agreement with LICENSORs invoice being issued on or before December 31, 2010, a second fee payment of [Confidential Information Omitted and filed separately with the Securities and Exchange Commission] EUR due on or before January 31, 2011 and the non-refundable minimum royalties (in EUR) specified below for each of the stated periods:

Period                    Minimum Royalty

Confidential Information Omitted and filed separately with the Securities and Exchange Commission]

3.3     Time and Method of Other Payments.

(a)     LICENSOR shall send LICENSEE an invoice after the end of each calendar year beginning with the 2012 calendar year for any shortfall between the amounts paid by LICENSEE to LICENSOR pursuant to Section 3.1 hereof during such calendar year and the Minimum Annual Royalty Payment due under Section 3.2 hereof. The aforementioned invoices will be paid by 25th day of the following month after LICENSOR has sent the applicable invoice.

(b)     All other payments shall be due on the date specified in this Agreement, or if no date is

specified, within 30 days of invoice.

(c)     The payment will be increased by 1% for
the amount due for each month or part thereof
for which LICENSEE is in arrears with payment.

(d)     All payments made to LICENSOR shall be
paid by wire transfer of immediately available
funds to the account of Research Frontiers
Incorporated at Chase Manhattan Bank, 6040
Tarbell Road, Syracuse, New York 13206, Account
No.: xxx-xxx-xxx, ABA Wire Code No.: 021 000 021,
 or to such other account or place, as LICENSOR
may specify in a notice to LICENSEE.

        3.4  Recordkeeping.

LICENSEE shall keep true and accurate records,
files and books of accounts that relate to
Light Valve Control Units and their use on
LICENSEE's vehicles, all data reasonably
required for the full computation and
verification of the manufacture, sale,
delivery and receipt of Light Valve
Control Units, deductions therefrom and
royalties to be paid.

LICENSOR and LICENSEE agree that an
independent certified public accounting
firm (selected by LICENSOR from the
largest ten certified public accounting
firms in the United States of America,
Germany or any country in the Licensed
Territory) may audit such records, files
and books of accounts to determine the
accuracy of the statements given by
LICENSEE pursuant to Section 3.1 hereof.
Such an audit shall be made upon reasonable
advance notice to LICENSEE and during usual
business hours. The cost of the audit shall
be borne by LICENSOR unless the audit shall
disclose a breach by LICENSEE of any term
of this Agreement, or an underpayment error
in excess of three percent of the total
monies paid to LICENSOR by LICENSEE during
the audited period, in which case LICENSEE
shall bear the full cost of such audit.
LICENSEE agrees to pay LICENSOR all
additional monies that are disclosed by
the audit to be due and owing to LICENSOR

within thirty days of the receipt of the
report.

4       OBLIGATIONS OF LICENSEE.

        4.1  Indemnification.  LICENSEE agrees
to indemnify and hold harmless LICENSOR and
SCSC, and each of their affiliates for any
claims, warranties, or liability relating
to the production, installation or use of
Light Valve Control Units.

        4.2  No Warranties by LICENSOR or
SCSC. LICENSOR and SCSC do not represent
or warrant the performance of any Light
Valve Control Unit or of any material,
component, or information provided
hereunder, and LICENSEE expressly
acknowledges and agrees that any such
material, Component or information
provided by LICENSOR and SCSC hereunder
is provided "AS IS" and that LICENSOR and
SCSC make no warranty with respect thereto
and  DISCLAIM ALL WARRANTIES, EXPRESS OR
IMPLIED,  INCLUDING BUT NOT LIMITED TO THE
IMPLIED WARRANTIES OF MERCHANTABILITY AND
FITNESS FOR A PARTICULAR PURPOSE, WITH
RESPECT THERETO, ITS USE OR ANY INABILITY
TO USE IT, OR THE RESULTS OF ITS USE. In
no event shall LICENSOR or SCSC be liable
for any damages, whether in contract or
tort (including negligence), including
but not limited to direct, consequential,
special, exemplary, incidental and
indirect damages, arising out of or
in connection with this Agreement or
the use, the results of use, or the
inability to use, or incorporation
into a vehicle of any Light Valve
Control Unit, material, component
or information provided hereunder.

5       TRADEMARKS.

All trademarks or service marks that
either party may adopt and use for
Light Valve Control Units or other
products incorporating Light Valves
are and shall remain the exclusive
property of the adopting party, and

the other party shall not obtain
any rights and license to such marks
under this Agreement, LICENSOR and
SCSC however are allowed to refer
to LICENSEE by using LICENSEE's
name Daimler AG.

LICENSOR may require LICENSEE to
indicate on packaging that Light
Valve Control Units are licensed
from Research Frontiers Incorporated
and SCSC or to otherwise include language
and/or designations agreed between LICENSOR
and LICENSEE indicating an affiliation
with Research Frontiers Incorporated
and/or SCSC or to use trademarks
specified by LICENSOR or SCSC on
LICENSEE's Light Valve Control Units
if required under applicable law.

6      INSURANCE AND INDEMNIFICATION.

       6.1  Insurance.  LICENSEE shall
maintain at all times ample product
liability and other liability insurance
covering its products.

       6.2  Indemnification.  LICENSEE
hereby indemnifies and agrees to hold
harmless LICENSOR and SCSC and their
respective shareholders, officers,
directors, agents and employees (each,
an "Indemnified Party"), against any
liability, damage, loss, fine, penalty,
claim, cost or expense (including
reasonable costs of investigation and
settlement and attorneys', accountants'
 and other experts' fees and expenses)
arising out of any action or inaction
by LICENSEE or its suppliers relating to
this Agreement including the manufacture,
sale, use, incorporation into a vehicle,
lease or other disposition of Light Valve
Control Units,  and related materials, or
other use of the information and rights
granted hereunder. Any knowledge of
LICENSEE's supplier's activities by
LICENSOR or SCSC or their respective
representatives shall in no way impose
any liability on LICENSOR or SCSC or

reduce the responsibilities of LICENSEE
hereunder or relieve it from any of its
obligations and warranties under this
Agreement.

7        FUTURE PATENTS.

        7.1  Future Patents.  Each party, at
its cost, shall have the right to file
patent applications in the United States
and in foreign countries covering any
invention made by such party.

        7.2  Improvements and Modifications.

(a) Any future improvements or modifications
invented or developed by or on behalf of
LICENSEE, LICENSOR or SCSC after the
Effective Date of this Agreement, if
any, which relate in any way to or are
useful in the design, operation,
manufacture and assembly of Light Valve
Control Units, Light Vales and/or to the
suspensions or other components used or
usable in Light Valves shall not be
included in this Agreement except as
specifically provided herein. Upon written
request by the non-inventing party, LICENSOR,
SCSC, and LICENSEE shall negotiate with each
other regarding the grant of nonexclusive
rights and licenses to use such improvements
and modifications, but neither party shall
be obligated to grant such rights and
licenses to one another.

        (b)  LICENSOR or SCSC, may voluntarily
add patents and/or patent applications to
Schedule A hereof, provided however, that
LICENSEE must agree in writing to accept
such additional patents and patent
applications for them to be validly
added to Schedule A hereof. No disclosure
of any information by LICENSOR or SCSC
shall in any way establish a course of
dealing or otherwise require LICENSOR or
SCSC to make any future disclosure of
information under this Agreement.

8        COMPLIANCE WITH LAWS

8.      Compliance with Laws

Whereas the PARTIES acknowledge that
the business operations including the
overseas activities and investments of
LICENSEE and its affiliated companies
are subject to the U.S. Foreign Corrupt P
ractices Act ("FCPA") as well as other
"APPLICABLE LAWS" (as defined below) the
PARTIES hereby confirm that they are
aware of the APPLICABLE LAWS, and, in
connection with the activities of the
PARTIES related to this Agreement, the
PARTIES hereby commit to strict
compliance with such APPLICABLE LAWS
and make the following representations
and warranties as of the date of this
Agreement and for the duration of this
Agreement in connection with its
activities related to this Agreement:

8.1     The PARTIES, for themselves and
on behalf of their "AFFILIATED PERSONS"
(as defined below) , represent, warrant
and covenant that:

a.      they and their AFFILIATED PERSONS
are solely responsible for complying, have
to their best knowledge complied, and will
comply, with APPLICABLE LAWS and have to
their best knowledge not taken and will
not take or fail to take any action,
which act or omission would subject
the respective other PARTY or its
affiliated companies to liability
under APPLICABLE LAWS;

b.      neither the PARTIES nor any
of its AFFILIATED PERSONS have, to
their or its best knowledge, offered,
 paid, given or loaned or promised to
pay, give or loan, or will offer, pay,
give or loan or promise to pay, give or
loan, directly or indirectly, money or
any other thing of value to or for the
benefit of any "GOVERNMENT OFFICIAL"
(as defined below), for the purposes of
corruptly (a) influencing any act or
decision of such GOVERNMENT OFFICIAL in
his official capacity, (b) inducing

such GOVERNMENT OFFICIAL to do or
omit to do any act in violation of
his lawful duty, (c) securing any
improper advantage or (d) inducing
such GOVERNMENT OFFICIAL to use his
influence with a "GOVERNMENT ENTITY"
(as defined below) to affect or
influence any act or decision of
that GOVERNMENT ENTITY, in each
instance to direct business to the
PARTIES or their affiliated companies; and

c.      in case the PARTIES or any of their
AFFILIATED PERSONS is or will become a
GOVERNMENT ENTITY or a GOVERNMENT OFFICIAL
whose official duties include decisions to
direct business to the respective other
PARTY or the same PARTY or its affiliated
companies or to supervise, or otherwise
control or direct the actions of,
GOVERNMENT OFFICIALS who are in a position
to direct business to the respective other
PARTY or the same PARTY or its affiliated
companies, the PARTIES or the respective
AFFILIATED PERSONS have to make sure, that
conflicts of interest will be excluded and
to inform the respective other PARTY
without undue delay about the measures
taken.

d.      the PARTIES shall assist and
cooperate fully with the efforts of the
respective other PARTY to comply with
APPLICABLE LAWS. In particular, the
PARTIES shall keep accurate books and
records and PARTIES shall immediately
notify the respective other PARTY of
any information that bribes or other
improper payments are being requested,
made or offered in connection with this
Agreement. Upon request of a PARTY,
the respective other PARTY shall make
those records which are necessary for
PARTIES to verify the respective other
PARTY's compliance with the APPLICABLE
LAWS relating to this Agreement
available to a sworn auditor who is
obligated to observe secrecy and selected
by the respective other PARTY. If such
auditor notices any failure by a PARTY

to comply with the APPLICABLE LAWS, such PARTY agrees that the auditor may disclose information relating to its failure to the respective other PARTY and, to the extent required by a legal demand by a competent court of law or government body, to third parties.

8.2    In no event will any Party be obligated to another Party under or in connection with this Agreement to act or refrain from acting if such Party believes that such act or omission would cause such Party to be in violation of APPLICABLE LAWS. In no event will any Party be liable to another Party for any act or omission which such Party believes is necessary to comply with APPLICABLE LAWS.

8.3    If a PARTY or any of their AFFILIATED PERSONS breaches any of the representations, warranties or covenants in this Clause each of which is deemed to be material and continuously made throughout the term of this Agreement, then, in addition to any other rights, the respective other PARTY may have under this Agreement:

a.    the respective other PARTY may declare a forfeit of any unpaid amounts owing to the breaching PARTY and will be entitled to repayment of any amounts paid or credited to the breaching PARTY, in each case, which are prohibited by APPLICABLE LAWS; and

b.    the respective other PARTY may immediately terminate this Agreement; and

c.    the breaching PARTY shall, upon first written request by the respective other PARTY, indemnify and hold harmless the respective other PARTY in regard to any and all cost and claims brought forward against the respective other PARTY

arising out of any failure of the
breaching PARTY to comply with its
representations, warranties and
covenants of this Clause.

8.4    For purposes of this Clause,
the following terms have the meanings
set forth below:

a.    "APPLICABLE LAWS"" means the
U.S. Foreign Corrupt Practices Act and
German anti-corruption laws, without
regard to their jurisdictional limitations,
U.S. and German export control laws to the
extent applicable the goods and or
information which are subject of this
Agreement, and all other laws, regulations,
rules, orders, decrees or other directives
carrying the force of law applicable to any
activities engaged in by the PARTIES or any
of their AFFILIATED PERSONS in connection
with this Agreement, in each case as the
same may be amended from time to time;

b.    "AFFILIATED PERSONS" means the
PARTIES' officers, directors, employees,
or agents, or any of their stockholders,
principals or owners acting on its
behalf or in its interests;

c.    "GOVERNMENT ENTITY" means a
government or any department, agency or
instrumentality thereof (including any
company or other entity controlled by a
government), a political party or a
public international organization; and

d.    "GOVERNMENT OFFICIAL" means any
officeholder, employee or other official
(including any immediate family member thereof)
of a GOVERNMENT ENTITY, any person acting in an
official capacity for a GOVERNMENT ENTITY
or any candidate for political office.

9 INTELLECTUAL PROPERTY PROTECTION RESPONSIBILITIES.

    9.1  Proprietary Rights: Notices.  Upon
request of LICENSOR, LICENSEE shall provide
appropriate notices of patents, or other similar
notice of the patent rights of the other party

on the Light Valve Control Units utilizing the patented inventions of LICENSOR or SCSC if the foregoing actions are required under applicable law.

9.2 LICENSOR Exclusive Owner. LICENSEE hereby acknowledges LICENSOR and SCSC as purporting to be the sole and exclusive owners of the patents and patent applications listed on Schedule A, and that, except for the rights granted hereunder, LICENSEE shall not have any rights or attempt to assert any ownership rights in and to those patents and patent applications.

10    TERM AND TERMINATION.

10. 1 Term. The Agreement becomes effective with the signature of the last undersigning contract partner and ends with the expiration of the last patent being subject of this Agreement in Schedule A (the "Term").

10.2 Termination by LICENSEE. If LICENSEE is no longer using any Intellectual Property in its vehicles, LICENSEE may terminate this Agreement at any time via certified letter upon at least six month prior to its termination. In case of termination of the Agreement prior to the expiration of the Term, LICENSEE will pay the Minimum Royalties due under section 3.2 hereof for that current calendar year plus the further Minimum Royalties being due under section 3.2 hereof for the following calendar year.

If the Agreement will be terminated by LICENSEE on or before December 31, 2013, LICENSEE pays the first fee, the second fee and the Minimum Royalties for 2012 and 2013 due under section 3.2 hereof.

Regardless of the termination of this Agreement by LICENSEE or LICENSOR and for the avoidance of doubt LICENSOR grants a license to the LICENSEE with respect to the spare parts to be

manufactured, distributed and sold
by LICENSEE until the end of the
lifecycle of vehicles assembled with
LVCUs. The according royalty for each
such spare part will amount to
 [Confidential Information Omitted
and filed separately with the
Securities and Exchange Commission].


      10.3  Termination by LICENSOR.
LICENSOR may terminate this Agreement
at any time upon at least 30 days' notice
to LICENSEE if LICENSEE is more than six
months overdue on any payment and LICENSEE
did not cure such default within thirty (30)
days after two written notices thereof with
a gap of four weeks sent from LICENSOR to
LICENSEE.

      10.4  Effect of Termination.  If
this Agreement expires or is terminated
for any reason whatsoever, in addition
to any other remedies which one party
may have against the other, all of
LICENSEE's, and its subsidiaries' and
supplier's rights and licenses under this
Agreement shall cease other than LICENCEE's
right to make, have made, distribute and
sell  spare parts as aforesaid.

Notwithstanding the foregoing, LICENSEE's
obligations to LICENSOR under Sections
3.1, 4.2, 6.1, 6.2, 7.2, 10.4, and Articles
8, 12, 13 and 14 shall survive any
termination or expiration of this Agreement.

11      SECTION 11 - INTENTIONALLY OMITTED

12      CONFIDENTIALITY.

      Each Party undertakes to treat as
confidential all technical and economic
information, especially intentions,
experience or findings and schemes to
which it is given access by the
respective other Party during the
duration of this Agreement, or which
it receives from the latter, for five

(5) full years following the date of
expiry of the Term and not to disclose
them to third parties or use them for
commercial purposes unless agreed
otherwise in writing between the Party.

        This confidentiality obligation
does not apply to information and
documents which

a)      were, demonstrably, already
known to the receiving Party prior
to the start of this co-operation;
b)      the receiving Party has,
demonstrably, lawfully received
from third parties;
c)      are generally known or
subsequently become generally
known without violation of the
obligations contained in this
Agreement;
d)      the receiving Party
demonstrably has developed within
the framework of its own independent
developments; or
e)      is required to be disclosed
by a party by law, regulatory
authority or pursuant to judicial order.

The Parties undertake to impose the
same obligations as taken on by the
Parties above on their employees and/or
sub-contractors who obtain knowledge
of such information and technical and
economic facts and experience, also for
the period following their resignation,
insofar as it is legally possible for
them to do so.

The Parties shall apply the same care
to secrecy as they adopt for the
handling of their own confidential information.

The terms and provisions of this
Agreement shall not be considered
confidential except that LICENSEE
may not disclose the minimum annual
royalty payments specified in
Article 3 or the  [Confidential
Information Omitted and filed separately

with the Securities and Exchange Commission]
without LICENSOR's prior written consent,
and the parties hereto acknowledge that,
pursuant to the Securities Exchange Act of
1934, as amended, and the regulations
promulgated thereunder,  LICENSOR may
file copies of this Agreement with the
Securities and Exchange Commission and
with NASDAQ and with any other stock
exchange on which LICENSOR's securities
may be listed.


13      WARRANTIES AND REPRESENTATIONS.

       13.1  Reciprocal Representations.
Each party represents and warrants to the
other that:

       13.1.1  Valid Agreement.  The
execution and delivery of this Agreement
by the officer or representative so doing,
and the consummation of the transactions
contemplated hereby, have been duly
authorized by all necessary corporate
action by LICENSOR and LICENSEE and
this Agreement is a valid and binding
obligation enforceable against the
parties in accordance with its terms,
except to the extent limited by
bankruptcy, insolvency, moratorium
and other laws of general application
relating to general equitable
principles;

       13.1.2 No Conflicts.  Nothing
herein conflicts with its rights and
obligations pursuant to any agreement
by a party and any other entity; and

       13.1.3  Publicity. The parties
shall have the right to use
non-confidential information, including
but not limited to information concerning
this Agreement, for investor relations
and regulatory disclosure purposes.
For marketing, sales and public
relation purposes, the Parties may
refer to the respective other Party

by (i) disclosing the respective
other Party's company name and (ii)
disclosing the information about a
license agreement being concluded
between the Parties and (iii) informing
about the Transportation Vehicles
incorporating, inter alia, LICENSOR's
or SCSC's technology.

The Parties have to refrain from any
advertising that exploits the reputation
of the respective other Party's brand
for the sake of the Party's own business
that would be considered "anlehnende Werbung"
under German law. Notwithstanding the
aforementioned, the Parties consent to
the respective other Party's use of
trademarks as may be necessary for the
purpose of describing a product or
describing whether a Party's technology
is used in another Party's product.

Each party shall have the right, but
not the obligation, to approve any use
by the other party of the first party's
name, logo, or other information about
Light Valves or Light Valve Transportation
Vehicle Window Products, and to require
the correction of any inaccurate information.

13.2  LICENSOR and SCSC Representations.
LICENSOR and SCSC each represents and warrants,
for the benefit of LICENSEE, that:

13.2.1  Title.  As of the date hereof,
LICENSOR and SCSC each represents and warrants
that it has the right to convey the rights and
licenses granted by this Agreement, and
otherwise to perform its obligations under
this Agreement. LICENSOR and SCSC has each
caused its employees who are employed to do
research, development, or other inventive
work to disclose to it any invention or
information within the scope of this
Agreement and to assign to it rights in
such inventions and information in order
that LICENSEE shall receive, by virtue of
this Agreement, the licenses granted to it
under Section 2.1 hereof.

13.2.2  Infringement.  As of the date hereof, neither LICENSOR nor SCSC is aware of any claim for patent infringement or the misappropriation of trade secrets, being asserted against it by any third party; or of any infringement of the patents listed on Schedule A hereto by any entity.

13.2.3 Patents in Force.  To the best of LICENSOR's and SCSC's knowledge with respect to their own intellectual property, all of the patents listed on Schedule A hereto are currently in force.

LICENSOR assumes no obligation for the future costs for the maintenance of the intellectual property rights listed in Schedule A and shall not be obligated to maintain such intellectual property rights.

13.3 No Warranty.  LICENSOR, SCSC and LICENSEE make no guaranty or warranty to one another under this Agreement (a) that LICENSEE will be able to develop, manufacture, sell or otherwise commercialize Light Valve Control Units, or (b) as to the validity of any patent.

14      MISCELLANEOUS.

14.1  Applicable Law.  This Agreement shall be construed in accordance with and governed by the laws of Switzerland. Any dispute, controversies or differences which may arise out of or in connection with the interpretation or performance of this Agreement that cannot be resolved by mutually amicable arrangement between the parties hereto shall be finally settled according the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules. The number of arbitrators shall

be three. The Chairman shall be of
juridical education. The place of
arbitration shall be London, UK.
The language to be used in the
arbitral proceedings shall be
English.

     14.2  Confidentiality In
Court Proceeding.  In order to
protect and preserve the confidential
information of a party which the
parties recognize may be exchanged
pursuant to the provisions of this
Agreement, the disclosing party may
request, and the receiving party
shall not oppose, the court in any
action relating to this Agreement
to enter a protective order to
protect information which is
confidential information under
Section 12 and to seal the record
in the action or to hold the
proceedings, or portion of the
proceedings, in camera; provided,
that the requested terms do not
prejudice the receiving party's
interests.  Nothing, however, shall
preclude either party from thereafter
moving to unseal its own records or
to have matter and information
designated as confidential under
any relevant protective order
designated otherwise in accordance
with the circumstances as they
shall appear at that time.

     14.3  Severability.  If any
provision of this Agreement is
declared or found to be illegal,
unenforceable or void, the parties
shall negotiate in good faith to
agree upon a substitute provision
that is legal and enforceable and
is as nearly as possible consistent
with the intentions underlying the
original provision.  If the remainder
of this Agreement is not materially
affected by such declaration or
finding and is capable of substantial
performance, then the remainder

shall be enforced to the extent
permitted by law.

14.4  Waiver.  Unless agreed
to by the parties in writing to the
contrary, the failure of either party
to insist in any one or more instances
upon the strict performance of any one
or more of the provisions of this
Agreement, or to exercise any right
contained in this Agreement or
provided by law, shall not
constitute or be construed as a
waiver or relinquishment of the
performance of such provision or
right or the right subsequently
to demand such strict performance
or exercise of such right, and the
rights and obligations of the
parties shall continue unchanged
and remain in full force and effect.

14.5  Captions.  The captions a
nd headings in this Agreement are
inserted for convenience and
reference only and in no way
define or limit the scope or
content of this Agreement and
shall not affect the interpretation
of its provisions.

14.6  Assignment. This
Agreement shall be binding on and
shall inure to the benefit of the
parties and their successors and
assigns.  LICENSOR or SCSC may
assign all of its rights and
obligations hereunder to any
successor to any of its business
interests or to any company
controlling or controlled by
LICENSOR. All assignees shall
expressly assume in writing the
performance of all the terms and
conditions of this Agreement to
be performed by the assigning
party, and an originally signed
instrument of such assumption
and assignment shall be delivered
to the non-assigning party within

30 days of the execution of such
instrument.

14.7  Schedules.  All
Schedules attached to this
Agreement shall be deemed to be
a part of this Agreement as if
set forth fully in this Agreement.

14.8  Entire Agreement.
This Agreement constitutes the
entire understanding and agreement
between LICENSOR, SCSC  and LICENSEE
with respect to the subject matter
hereof, supersedes all prior
agreements, proposals, understandings,
 letters of intent, negotiations and
discussions with respect to the
subject matter hereof and can be
modified, amended, supplemented or
changed only by an agreement in
writing which makes specific
reference to this Agreement and
which is executed in writing by
the parties; provided, however,
that either party may unilaterally
waive in writing any provision
imposing an obligation on the
other.

14.9  Notices.  Any notice
required or permitted to be given
or made in this Agreement shall be
in writing and shall be deemed
given on the earliest of (i)
actual receipt, irrespective of
method of delivery, (ii) on the
delivery day following dispatch
if sent by express mail (or
similar next day courier service),
or (iii) on the sixth day after
mailing by registered or certified
air mail, return receipt requested,
postage prepaid and addressed as
follows:

LICENSOR:

        Joseph M. Harary, President and CEO
        Research Frontiers Incorporated

240 Crossways Park Drive
Woodbury, New York 11797-2033 USA
Facsimile:      (516) 364-3798
Telephone:      (516) 364-1902

SCSC:

Mr. John Petraglia, CEO
SPD Control Systems Corporation
CEWIT/SBU R&D Park
1500 Stony Brook Road
Stony Brook, New York 11794-6040
Facsimile:      (631) 776-8501
Telephone:      (631) 776-8500

LICENSEE:

 [Confidential Information Omitted and filed
separately with the Securities and
Exchange Commission]

or to such substitute addresses and persons
as a party may designate to the other from
time to time by written notice in
accordance with this provision.

14.10 Bankruptcy Code.  In the
event that any party hereto should file
a petition under the national bankruptcy
laws, or that an involuntary petition shall
be filed against such party, the parties
intend that the non-filing party shall be
protected in the continued enjoyment of
its rights hereunder to the maximum
feasible extent.  Each party agrees that
it will give the other parties immediate
notice of the filing of any voluntary or
involuntary petition under the federal
bankruptcy laws.

14.11  Construction.  This
Agreement and the exhibits hereto
have been drafted jointly by the
parties and in the event of any
ambiguities in the language hereof,
there shall no be inference drawn
in favor or against either party.

14.12  Counterparts.  This
Agreement may be executed in any

number of counterparts, each of
which shall be deemed an original,
but all of which shall constitute
one and the same instrument.

14.13 Status of the Parties.
The status of the parties under this
Agreement shall be solely that of
independent contractors. No party
shall have the right to enter into
any agreements on behalf of the other
party nor shall it represent to any
person that it has such right or
authority.

The parties, through their
duly authorized representatives,
and intending to be legally bound,
have executed this Agreement, as of
the date and year first above written,
whereupon it became effective in
accordance with its terms.

RESEARCH FRONTIERS INCORPORATED


By:_____
Joseph M. Harary, President
Date: December 22, 2010

SPD CONTROL SYSTEMS CORPORATION


By:_____
John Petraglia, CEO
Date: December  22, 2010



DAIMLER AG

By:_____        By:_____

Date: December 22, 2010


Schedule A
(As of the Effective Date)

Research Frontiers Intellectual Property:

LIST OF UNITED STATES, INTERNATIONAL AND
FOREIGN PATENTS AND PATENT APPLICATIONS

| Patents in the United States | | Date Issued | Expiration Date |
|---|---|---|---|
| 6,804,040 | Albert P. Malvino, et al | | |
| "Method and Device for Controlling Voltage Provided to a Suspended Particle Device" | | 10/12/04 | 02/13/23 |
| 6,897,997 | Albert P. Malvino | | |
| "Method and Device for Controlling Voltage Provided to a Suspended Particle Device" | | 05/24/05 | 02/13/23 |
| (continuation-in-part of 6,804,040) | | | |
| 7,417,785 | Albert P. Malvino | | |
| "Methods and Circuits for Distributing Powerto SPD Loads" | | 08/26/08 | 01/18/25 |

PENDING UNITED STATES APPLICATIONS

Serial Number                                    Filing Date


[Confidential Information Omitted and filed separately
with the Securities and Exchange Commission]



    PENDING INTERNATIONAL APPLICATIONS
Serial Number                                    Filing Date

 [Confidential Information Omitted and filed separately with the
Securities and Exchange Commission]


SCSC Intellectual Property

LIST OF UNITED STATES, INTERNATIONAL AND
FOREIGN PATENTS AND PATENT APPLICATIONS
ASSIGNED TO
SPD CONTROL SYSTEMS CORPORATION

| Patents in the United States | | Date Issued | Expiration Date |
|---|---|---|---|
| 7,800,812 | Jay Moskowitz | 08/11/10 | 09/23/26 |

"Intelligent SPD control apparatus with scalable networking
capabilities for window and multimedia applications"


Abstract: A scalable apparatus and a network environment
dynamically changes the light transparency of a single SPD
device, a small number of SPD devices or thousands of such
SPD devices installed in windows in automobiles, aircraft,
trains, marine vehicles, residential homes, commercial
buildings and skyscrapers. A scalable apparatus and a
network environment dynamically changes the light
transparency of a single SPD device or thousands of
such SPD devices in the presentation of a multi-media
special effects display. Textual messages, graphical
images and simulated motion effects are driven. Such
scalable apparatus being capable of driving and using
several operational parameters of SPD materials such
as frequency range, AC voltage and temperature so as
to provide fine control of SPD characteristics such
as switching speed and power consumption.

PENDING UNITED STATES APPLICATIONS


 [Confidential Information Omitted and filed separately with the
Securities and Exchange Commission]

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99
<SEQUENCE>3
<FILENAME>ex99.txt
<DESCRIPTION>SPD CONTROL SYSTEMS NEWSLETTER DATED FEBRUARY 8, 2011
<TEXT>
             SPD Control Systems Corp. Licenses its
               Automotive Intellectual Property

Tuesday, February 8, 2011



It gives us great pleasure to announce that Daimler AG, the
manufacturer of Mercedes-Benz and other premium vehicles, has
licensed a package of intellectual property (IP) for
automotive electronic controllers of suspended particle device
(SPD) automotive products. This package contains electronics
IP that was developed by SPD Control Systems Corporation (SCSC)
and Research Frontiers Inc. (Nasdaq: REFR), developer of SPD

light-control technology, which our two companies licensed jointly to Daimler. The Daimler electronics SPD license provides for a royalty covering all Daimler cars, trucks and other vehicles utilizing the licensed IP.

[Link to Research Frontiers Inc. (RFI) Press Release]

At its 125th anniversary celebration in Stuttgart, Germany on January 29, 2011, Daimler AG premiered the 2012 Mercedes-Benz SLK which features the new "MAGIC SKY CONTROL" panoramic sunroof. This revolutionary sunroof is made with SPD-SmartGlass. Two important features of the MAGIC SKY CONTROL roof are the electronically tintable SPD-SmartGlass that changes from dark to clear instantly, and the fact that this glass is capable of keeping the vehicle up to 10 degrees C cooler when exposed to the hot sun.

SPD-SmartGlass uses a thin film containing nanoparticles that allows users to instantly and precisely control light, heat and glare. Our licensor, Research Frontiers, has spent over $80 million to develop this technology, and has licensed it to 39 companies around the world. These licensees include some of the world's major chemical companies and most of the world's automotive glass production. SCSC's role is to supply electronics products and intellectual property to these licensees and their customers. Because SPD-Smart technology has key performance advantages over other technologies, such as fast switching speeds that permit real-time response by the glass to electrical inputs, functionality and energy savings can be optimized by the intelligent use of electronics to control this remarkable glass.

Just like an operating system is a key part of a computer, providing the intelligence to unleash its power, so too is the potential for intelligent electronics to unleash the many benefits of SPD-Smart light-control technology. For example, energy loads and climate control can be optimized in an office or a vehicle using intelligent electronics to control the SPD-SmartGlass. This can save energy, increase occupant comfort and safety, reduce CO2 emissions, and maximize the benefits of daylight harvesting. Air conditioners in cars can be made smaller and HVAC systems in buildings can be made to take up less space and use less energy, thus saving money and increasing revenues to building owners since it provides more design freedom and can increase rentable space.

In August 2010 the U.S. Patent Office granted SCSC a comprehensive electronics patent for controllers that operate SPD-Smart dynamic tinting windows. SCSC currently has 4 domestic and international patents pending and will be filing additional patents. These patents cover the electronic control of SPD technology in automobiles, boats, aircraft, commercial buildings and residential homes.

Licensing of our IP is only one part of SCSC's business. We also are focused on the sale of controllers to auto manufacturers as well as the automotive aftermarket. The company anticipates that another significant market will be in the worldwide sale of electronic controllers and energy management control systems for the commercial and residential architectural marketplace. SCSC recently successfully completed work under a contract from the New York State Energy Research and Development Authority (NYSERDA) and demonstrated a prototype of a sophisticated SPD Building Energy Management Control System (BEMCS). Our BEMCS, using wireless technology and our TintMaker controllers, enables all of the windows in a residence or commercial building to have "building intelligence." This will optimize energy utilization of buildings, improve occupant comfort and productivity, enhance aesthetics, and support sustainable building design. The building's windows are controlled manually and automatically.

John Petraglia, CEO of SCSC, states: "SCSC has achieved key milestones in our drive to become a major supplier of products and services in the global SPD marketplace. First, SCSC's broad patent was granted that protects our products. Our next milestone was the completion our first licensing agreement, which signals industry recognition of our leadership in the electronics segment of the emerging SPD industry. These two milestones allow SCSC to continue our aggressive efforts to accelerate the use of our leading-edge SPD-Smart products and design services. As SPD-SmartGlass is adopted by other automotive manufacturers, we anticipate additional licensing and controller sales."

Jay Moskowitz, Chairman and Founder of SCSC, noted, "SCSC was created to deliver sophisticated

state-of-the-art electronic control and energy
management systems for the automotive, aerospace,
architectural and marine marketplaces. Our
patent portfolio reflects the integration of
technologies to deliver feature-rich and
flexible electronic controls wherever
SPD-SmartGlass is being utilized. The
licensing of our IP to a leading automotive
company is a major step in achieving our
corporate goals of providing comprehensive
control systems that will realize the
energy conservation and user satisfaction
potential of SPD-Smart light-control
technology."


For inquiries please contact:


SPD Control Systems Corporation
CEO & President
John Petraglia
Center for Wireless and information Technology (CEWIT)
Stony Brook University Research & Development Park
1500 Stony Brook Road
Stony Brook, NY 11894-6040
info@spdControlSystems.com


"SPD-Smart" and "SPD-SmartGlass" are trademarks of
Research Frontiers Inc.

"Magic Sky Control" and "Mercedes-Benz" are
trademarks of Daimler AG.

"TintMaker" is a trademark of SPD Control
Systems Corporation
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----