## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**GLOBAL GLASS TECHNOLOGIES, INC.,**

      **Plaintiff,**

**v.**                                **Case No: 8:20-cv-2517-MSS-AEP**

**RESEARCH FRONTIERS, INC. and GAUZY LTD.,**

      **Defendants.**

_____

## ORDER

**THIS CAUSE** is before the Court for consideration of the cross-motions for Summary Judgment. (Dkts 107 & 109) Upon consideration of all relevant filings, case law, the Parties' arguments at the October 18, 2023 hearing, and being otherwise fully advised, Defendants' Motion for Summary Judgment **is GRANTED as stated herein**.

## I.      BACKGROUND

This action concerns several licensing agreements and patents concerning Suspended Particle Device ("SPD") technologies. The heart of the bifurcated proceeding currently before the Court is an alleged breach of contract between Plaintiff Global Glass Technologies, Inc. ("Global Glass") and Defendant Research Frontiers, Inc. ("RFI"). (Dkt. 38) After a hearing on the pending motions in this case, the Court enters the following findings of fact and conclusions of law.

## II.     FINDINGS OF FACT

### A. THE SUMMARY JUDGMENT MOTIONS

1.     On October 25, 2005, non-party SPD Control Systems Corporation (hereinafter referred to as "SCSC") entered into a license agreement with the Defendant, Research Frontiers, Inc. (hereinafter referred to as "RFI"), entitled the "SPD-Smart Electronics License Agreement between Research Frontiers Incorporated and SPD Control Systems Corporation" (hereinafter the "Master License Agreement."). (Dkt. 107-1 at 2)

2.     Global Glass is not a party to the Master License Agreement. (Id.)

3.     There is no agreement or contract between RFI and Global Glass.

4.     Pursuant to the Master License Agreement RFI is the "LICENSOR" and SCSC is the "LICENSEE." (Id.)

5.     The Master License Agreement defines "Licensed Products" as follows: "Licensed Product" means electronics, including, but not limited to, circuit boards, controllers, connectors and wiring, used to operate products incorporating a Light Valve, but shall not include products incorporating a Light Valve unless a separate license agreement between LICENSOR and LICENSEE or its affiliated companies specifically permitting the production of products incorporating a Light Valve is hereafter signed and becomes effective. Nothing in this agreement shall permit LICENSEE to sell, lease, or otherwise dispose of a Light Valve. (Id. at 2-3)

6.     The Master License Agreement sets forth the terms of termination as follows:

10.4 Effect of Termination. If this Agreement expires or is terminated for any reason whatsoever, in addition to any other remedies which one party may have against the other:

\*\*\*

(3) if this Agreement is terminated for any reason or expires, upon such termination or expiration, [SCSC] will either

(A) sell its business to a third party to make Licensed Products (provided however that [RFI] shall have the right to approve in its sole and absolute discretion any such successor entity of intellectual property rights of [RFI] are needed for successor entity to operate its business), provided further, however, that such third party can insure the uninterrupted and adequate supply of Licensed Products to all RFI Licensees (as that term is defined in Section 3.4 hereof) and their customers, or, if compliance with all of the conditions described in this clause (A) of this Section 10.4 are not possible or cease to apply, then

(B) grant to [RFI] a non-exclusive, royalty-free, irrevocable, worldwide license with the right to grant sublicenses to others to utilize all technical information, improvements and/or modifications (whether or not the subject of patents or pending patent applications) developed or invented by or on behalf of [SCSC] and/or its sublicensees, subcontractors, or agents hereunder through the date of such termination or expiration of this Agreement relating to Light Valves, or Licensed Products, and upon such termination or expiration [SCSC] shall provide [RFI] in reasonable detail complete information regarding such technical information, improvements and/or modifications. The foregoing license shall be self-effectuating, but [SCSC] agrees upon written notice by [RFI] at any time hereafter to deliver to [RFI] within 30 days of such notice any document or other instrument reasonably requested by [RFI] to convey such license rights to [RFI] such as, by way of example, confirmations or instruments of conveyance or assignment.

(Id. at 12-13)

7.     On May 9, 2010, RFI and SCSC amended the Master License Agreement

by an agreement titled "Amendment to License Agreement Effective as of October 25,

- 3 -

2005, between [RFI] and [SCSC] and Senior Secured Convertible Note of SCSC, dated

May 9, 2007, and modified on November 28, 2007," which is hereinafter referred to

as the "2010 Daimler Royalty Sharing Agreement." (Dkt. 107-4, Exh. C-2 at 2)

8.    Global Glass is not a party to the 2010 Daimler Royalty Sharing

Agreement. (Dkt. 107-4 at 2)

9.    Pursuant to the 2010 Daimler Royalty Sharing Agreement, RFI and

SCSC agreed that:

> [SCSC] and [RFI] shall each be entitled to half of the net proceeds,
> if any, received by [RFI] from Daimler AG pursuant to an
> electronics license currently being negotiated between [SCSC],
> Daimler AG, and [RFI] pursuant to which [SCSC]s' intellectual
> property will be licensed.

(Id. at 2)

10.    On December 22, 2010, RFI, SCSC and Daimler AG entered into the

SPD Electronics Patent License Agreement ("Daimler License"). Through the

Daimler License, RFI is identified as the LICENSOR, SCSC is identified as SCSC,

and Daimler AG is identified as the LICENSEE. (Dkt. 107-2 at 6)

11.    Through the Daimler License, SCSC granted to RFI a non-exclusive

right and license (including the right to grant sublicenses) to sublicense to Daimler any

invention claimed in certain patents. (Id. at 8)

12.    Through the Daimler License, RFI granted Daimler a non-exclusive right

and license to make, have made, use, distribute, offer, lease, sell or otherwise dispose

of any invention claimed in certain patents. (Id.)

13.    Pursuant to the Daimler License, Daimler agreed to pay RFI certain royalties. (Id. at 9) SCSC has no right to any royalties under the Daimler License.

14.    RFI and SCSC agreed to share the Daimler royalties that RFI was receiving. (Dkt. 107-9 at ¶ 6) RFI and SCSC agreed that portions of SCSC's share of the Daimler royalties would be used to pay past due amounts due from SCSC to RFI. (Id.).

15.    In an agreement dated December 19, 2014 (the "2014 Letter Agreement"), RFI and SCSC acknowledged that the Master License Agreement would terminate on December 31, 2014, following SCSC's notice of termination but that RFI and SCSC would continue to share the Daimler royalties. (Dkt. 107-9 at ¶ 6; Dkt. 107- 3 at 3) RFI and SCSC continued to agree to terms for how SCSC was to pay off amounts still owed by SCSC to RFI. (Id.)

16.    On December 6, 2016, SCSC, by and through its founder and chairman Jay Moskowitz, acknowledged defaulting under a Secured Convertible Note held by Global Glass and signed a Post-Default Consent Agreement (hereinafter referred to as the "Post-Default Consent Agreement"). (Dkt. 107-5 at 2)

17.    In the Post-Default Consent Agreement, SCSC acknowledged one or more events of default and consented to the transfer of certain identified Collateral to Global Glass. (Id.) The Post-Default Consent Agreement defined Collateral as follows:

> all material (i) patents, patent applications, patent disclosures and all related continuation, continuation-in-part, divisional, reissue, reexamination, utility model, certificate of invention and design patents, patent applications,

registrations and applications for registrations, (ii) trademarks, service marks, trade dress, logos, trade names and registrations and applications for registration thereof, (iii) copyrights and registrations and applications for registration thereof, (iv) computer software (in both source code and object code form), data and documentation, (v) trade secrets and confidential business information, whether patentable or unpatentable and whether or not reduced to practice, manufacturing and production processes and techniques, research and development information, business and marketing plans and customer and supplier lists and information.

(Id.)

18.     The Post-Default Consent Agreement provided that: "Within ten (10) days after both parties execute this Post-Default Consent, [SCSC] will provide an asset transfer document ('the Document') which details all of the assets being transferred to [Global Glass]." (Id.)

19.     In connection with the Post-Default Consent Agreement, SCSC informed Global Glass as follows:

> There is a separate agreement between RFI and SCSC under which RFI shares the Daimler royalties 50/50 with SCSC. That agreement is not a transferable agreement to a third party. As we have reported numerous times in Emails for more than a year, do not expect RFI to share these royalties with [Global] or NewCo or any future owner of the patents. They are under no obligation to transfer this agreement from SCSC. Expect them to retain 100% of the Daimler royalties upon the dissolution of SCSC. We know RFI very well and it can be expected that they will retain 100% of the royalties.

(Dkt. 115-2 at 8)

20.     On September 26, 2019, SCSC instructed RFI to "refrain from issuing any ongoing wire/ACH transfer of funds to SCSC as related to the Daimler royalty payments under the [2014 Letter Agreement]. Please discontinue payments to SCSC of royalties for shipments made September 2019 and beyond." (Dkt. 107-8 at 3) SCSC

further stated that "the instruction above is intended to be effective for all funds due under the December 19, 2014 agreement from the date of this notice going forward." (Id.) RFI made all payments due to SCSC from the beginning of the Daimler License until SCSC instructed RFI to stop. (Dkt. 110-1 at ¶ 2) After SCSC provided this instruction, RFI no longer had any obligation to pay any royalties to SCSC under the 2014 Letter Agreement.

21. Recognizing that it did not acquire any interest in the 2014 Letter Agreement through the Post-Default Consent Agreement, Global Glass attempted to self-deal those rights to itself signing a Purported GGT-SCSC Assignment Agreement on behalf of itself and SCSC. Global Glass sought to justify its signature on behalf of SCSC by stating that it had some power of attorney permitting it to assign away SCSC's rights. But Global Glass later recognized that it does not, and never had, any such power of attorney. Global Glass further recognized that its attempt to self-deal SCSC's contractual rights away from SCSC and to Global Glass failed and Global Glass has no interest in SCSC's contractual rights through its attempted self-dealing assignment.

22. SCSC is no longer an ongoing concern. SCSC administratively dissolved with the New York Secretary of State on October 18, 2022.

23. RFI offered Global Glass certain terms under which RFI would share the Daimler royalties with Global Glass. Global Glass refused to accept those terms. RFI then withdrew its offer to share royalties with Global Glass. As such, RFI has no obligation to share any revenue it receives from Daimler with Global Glass.

24.     Upon SCSC's termination of the Master License Agreement, RFI was granted a worldwide license to SCSC's technology pursuant to Section 10.4(3)(B). This license entitles RFI to freely make, use, and sublicense SCSC's technology, including the Asserted patents, to any third party without owing any royalty or other obligations to whoever owns the SCSC patents. The parties intended for RFI to be granted such a license upon termination because SCSC was a new and unfamiliar licensee to RFI and RFI needed appropriate safeguards in place to hedge its risk against the possibility that SCSC would not be able to successfully manufacture electronic controllers to control Light Valves (as defined in the Master License Agreement) or have the financial or other ability to make these products, thereby putting RFI in a position where SCSC would no longer be able to offer these products to RFI's customers. (Dkt. 107-9 at ¶ 5)

25.     The termination provision of the Master License Agreement clearly states that RFI gets a worldwide license to all SCSC technology "relating to Light Valves or Licensed Products."

## B. THE SANCTIONS MOTION

1.     On October 27, 2020, Global Glass filed its initial complaint, asserting the following counts: Count 1 – Breach of Contract against RFI; Count II – Quantum Meruit against RFI; Count III – Unjust Enrichment against RFI; Count IV – Mandatory Injunctive Relief against RFI; Count V – Declaratory Judgment against RFI; Count VI – Inducement of Patent Infringement against RFI; Count VII – Patent Infringement against Gauzy; Count VII – Patent Infringement against Vision Systems North America, Inc. (Dkt. 1)

2.      Defendants met and conferred with Plaintiff and explained why Plaintiff's Complaint was due to be dismissed. Plaintiff agreed to file an amended complaint. (Dkt. 20 ("Plaintiff has agreed to amend its complaint, but requires additional time to do so.")) The Court then set April 9, 2021, as the new deadline for response. (Dkt. 21)

3.      The day before the new response deadline, on April 8, 2021, Plaintiff indicated that it "will not be Amending our Complaint at this time." (Dkt. 24) Defendants explained:

> Defendants relied on Plaintiff's agreement that it would amend its complaint, and stopped revising their motion to dismiss on March 19, 2021, in an effort to conserve litigation resources. In light of Plaintiff's change of position, provided the day before the response deadline and without any indication of any legal basis in opposition to Defendants' forthcoming motion to dismiss, Defendants require an extra week in order to finalize the motion to dismiss.

(Id. at 1-2) The Court granted the further extension, setting the new deadline to April 16, 2021. (Dkt. 25)

4.      On April 16, 2021, Defendants sent their first Rule 11 letter to Plaintiff. (Dkt. 129-9) The April 16, 2021, letter provided in part that:

> Plaintiff's attempt to plead the patent infringement claim was insufficiently investigated and must be dismissed. *See Antonious v. Spalding & Evenflo Companies, Inc.*, 275 F.3d 1066, 1074 (Fed. Cir. 2002) ("An attorney's allegation of infringement is therefore subject to the requirement of Rule 11(b)(3) that all allegations and factual contentions have evidentiary support."). Prior to filing a patent infringement claim, counsel must analyze an accused device, and come to his or her own conclusion that the device infringes a valid claim of the asserted patent. *See id.* ("[C]ounsel must make a reasonable effort to determine whether the accused

device satisfies each of the claim limitations." (citing *Judin v. U.S.*, 110 F.3d 780, 784, (Fed. Cir. 1997))).

(<u>Id.</u> at 3)

5.      Defendants moved to dismiss the Complaint on April 16, 2021. (Dkt. 30) Rather than responding to the motion, Plaintiff filed its Amended Complaint on May 7, 2021. (Dkt. 31) The Amended Complaint dropped Vision Systems as a party and asserted the following counts: Count I – Breach of Contract against RFI; Count II – Declaratory Relief against RFI and Gauzy; Count III – Mandatory Injunctive Relief against RFI and Gauzy.

6.      Defendants moved to dismiss the Amended Complaint. (Dkt. 34) Defendants explained:

> Plaintiff filed its original complaint without conducting any pre-suit investigation in order to be able to properly plead a claim for patent infringement. Defendants notified Plaintiff of these defects, but Plaintiff persisted. So, Defendants filed their first motion to dismiss. In response, Plaintiff filed the Amended Complaint. Through the Amended Complaint, Plaintiff seeks to recast its patent infringement claims under different titles, hoping to avoid the obligation to actually investigate its claims to pursue a patent infringement injury. Such gamesmanship is not warranted and has resulted in Plaintiff making unnecessary pleadings with obvious defects which have wasted the time and resources of the Court and of Defendants.

(<u>Id.</u> at 1-2)

7.      The Court granted Defendants' Motion to Dismiss the Amended Complaint. (Dkt. 37) The Court stated that "Defendant's argument that Count II is a disguised patent infringement claim fails because Count II, as Global Glass notes, does

not assert a patent claim against RFI or Gauzy." (Id. at 6) The Court granted Plaintiff leave to file a Second Amended Complaint. (Id. at 11)

8.      On December 20, 2021, Plaintiff filed the Second Amended Complaint. (Dkt. 38) The Second Amended Complaint asserts the following counts: Count I – Breach of Contract against RFI; Count II – Declaratory Relief against RFI and Gauzy; Count III – Inducement of Patent Infringement against RFI; Count IV – Patent Infringement against Gauzy.

9.      Through the patent infringement counts, Plaintiff asserted U.S. Patent Nos. 7,800,812 ('812 Patent), 8,792,154 ('154 Patent), and 9,658,509 ('509 Patent) (collectively, the Asserted Patents) were allegedly infringed.

10.     On January 18, 2022, Defendants sent their second Rule 11 letter to Plaintiff. Through that letter, Defendants explained:

> Sadly, this is not the first Rule 11 letter I have had to send to you. I attach for your convenience my April 16, 2021 Rule 11 letter explaining how your original Complaint demonstrated a lack of compliance with Rule 11. Your Second Amended Complaint attempts to reinject patent theories when it is clear you have not done the investigation required by Rule 11 in the patent context. Rule 11 requires that [an] attorney filing the claim conduct a reasonable investigation into the claim and that the claim have evidentiary support.
>
> * * *
>
> We have previously warned and advised you of your obligation to conduct an actual investigation and perform due diligence before asserting a patent infringement claim. Rather than adhere to your obligation to actually investigate whether or not claims of infringement exist, including identifying particular claims that may be infringed, analyzing whether those claims are valid, analyzing what interpretations should be provided to those claims, and analyzing what products purportedly practice each element of the identified claims, you have instead attempted to circumvent your obligations. When we first brought these issues to your attention, you reneged on your promise to

amend your complaint and forced us to prepare and file a motion to dismiss.
Instead of responding to that motion, you amended your complaint and
removed your patent allegations. When our motion to dismiss that amended
complaint was granted, you filed a Second Amended Complaint reinjecting the
patent theories that you know are defunct and unsustainable. This violates Rule
11 and exposes you and your client to sanctions.

(Dkt. 129-10 at 2, 5)

11.    On May 9, 2022, Plaintiff filed a notice of appearance advising inter alia

that Gabrielle Alexa Penalta was being added as an additional counsel of record.

12.    On June 24, 2022, Plaintiff served its Preliminary Infringement

Contentions. (Dkt. 51) Defendants then requested additional time to serve their

invalidity contentions because: Plaintiff's infringement contentions, rather than focus

on a subset of claims, instead essentially assert each and every claim of the three at

issue patents (U.S. Patent Nos. 7,800,812, 8,792,154, and 9,658,509), requiring

Defendants' invalidity contentions to address all 124 claims. (Dkt. 52 at 1) The Court

granted the additional time requested.

13.    After service of invalidity contentions, on August 23, 2022, the K&L

Gates firm appeared as co-counsel for Plaintiff. (Dkt. 56)

14.    On November 14, 2022, Defendants' counsel spoke with the K&L Gates

lawyers. He also provided the K&L Gates lawyers with the two Rule 11 letters that

were sent to Plaintiff's counsel.

15.    On December 16, 2022, the K&L Gates lawyers moved to withdraw as

counsel. (Dkt. 73) Those lawyers indicated that "Peter Ticktin, on behalf of the Ticktin

Law Group, notified K&L Gates that it consented to K&L Gates' withdrawal and that Plaintiff has consented as well." (Id.) The Court granted their withdrawal. (Dkt. 74)

16.    On February 6, 2023, the Magistrate Judge conducted a discovery hearing on a discovery motion Plaintiff brought. During that hearing, the following exchange took place:

> THE COURT: You're not helping me there. Give me specific facts as to what actions the defense is infringing.
>
> THE COURT: Let me interrupt you. I'm fully aware of that. So you say Gauzy is using it. What customer are they using it with and how are they infringing? MR. TICKTIN: I don't know that yet. I mean that is what we need to have the discovery for. We understand –
>
> THE COURT: But I don't understand then how are you bringing suit if you have no idea of any infringement? *** There's been no articulation to date in any specific end use customer that would be utilizing licenses that were not approved by the plaintiff. So that is troublesome for me given how this suit was initiated to begin with.

(Dkt. 100 (emphasis added))

17.    Based on Plaintiff's admission at this discovery hearing, Defendants sent their third Rule 11 letter to Plaintiff on February 19, 2023. Through that letter, Defendants explained:

> Notably, Global Glass has repeatedly demonstrated its inability to identify any product that teaches every limitation of any claim of the '812, '509, or '154 Patents. Had Plaintiff conducted any sort of presuit analysis, it would have easily determined that its patent infringement claims against RFI and Gauzy are without merit. In pursuing patent claims, a patent holder is obligated to conduct a reasonable prefiling investigation to compare the claims of an asserted patent to an accused product. Before filing [claims] of patent infringement, Rule 11, we think, must be interpreted to require the law firm to, at a bare minimum, apply the claims of

- 13 -

each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted. The presence of an infringement analysis plays the key role in determining the reasonableness of the pre filing inquiry made in a patent infringement case under Rule 11. View Engineering, Inc. v. Robotic Vision Systems, Inc., 208 F.3d 981, 986 (Fed. Cir. 2000). Indeed, the View Engineering Court explicitly recognized that failure to conduct any analysis is a basis for sanctions under Rule 11. See id. ("Morrison performed neither a formal nor an informal analysis of any sort. This cannot be found to be a reasonable inquiry for the purpose of filing patent infringement claims."). Here, Plaintiff admits that it undertook no pre-suit analysis directed to either Defendant. Plaintiff's infringement contentions bear out that no analysis was conducted, because neither RFI nor Gauzy plausibly infringes any of the asserted patents. Courts take the pre-suit investigation requirement in patent cases seriously and have imposed sanctions for failing to ask for technical information prior to instituting suit, failing to obtain an independent infringement opinion from counsel, and failing to attempt to reverse engineer the accused product. See Judin v. United States, 110 F.3d 780, 784 (Fed. Cir. 1997); see also View Engineering, 208 F.3d at 985.

* * *

While Gauzy has other noninfringement defenses, it is clear that Global Glass cannot even make out a prima facie case of infringement and has included patent infringement claims simply to increase the litigation burden on both Defendants and the Court. As such, Global Glass should dismiss its patent infringement claims so both Parties can more appropriately direct their time and resources towards resolving the contractual dispute stemming from the Parties' differing interpretation of the Master License Agreement. (Dkt. 129-11 at 2-4)

18. In response to the third Rule 11 letter, Plaintiff initially agreed to dismiss the patent claims, but that deal broke down when the parties could not agree on whether dismissal should be with or without prejudice. (Dkt. 103) The Court then bifurcated the patent issues staying all patent deadlines. (Dkt. 106)

19.     On August 16, 2023, Defendants sent their Motion for Sanctions pursuant to Fed. R. Civ. P. 11, 28 U.S.C. § 1927, and the Court's Inherent Power to Plaintiff's counsel. (Dkt. 129 at 25) Plaintiff did not respond to Defendants' notice. Plaintiff then filed its Motion for Sanctions on September 7, 2023. (Dkt. 129)

20.     Defendants' Motion for Sanctions argued that Plaintiff did not conduct a reasonable pre-suit investigation into its purported patent claims and that Plaintiff did not conduct a reasonable pre-suit investigation into its contract claims.

21.     Plaintiff responded on September 21, 2023. (Dkt. 132) Through its response, Plaintiff did not identify any pre-suit claim charts that were prepared to analyze the language of any patent claims as they related to any accused products. Instead, Plaintiff provided three documents that Plaintiff characterizes as charts, but that were not reviewed or analyzed by Plaintiff before filing the Second Amended Complaint.

22.     Plaintiff further argued that "[i]f a patent holder is well versed with the products of an infringer and knows of the claims in the patent, there is no need for an in-depth formal investigation." (Dkt. 132 at 3-4)

23.     Plaintiff's counsel did not prepare any pre-suit patent claim charts.

24.     Defendants served the following interrogatory on Plaintiff: Identify all pre-suit infringement charts (including all documents any such chart relies upon for factual support) relating to any allegations of infringement you have made in this lawsuit. Please include in your identification an identification of all people involved and the dates of such infringement charts. (Dkt. 129-3)

25.     Plaintiff responded to this interrogatory as follows:

RESPONSE: A pre-suit chart "infringement Analysis for First Independent Claim of US8792154" was created on or around September of 2006. The Excel sheet was given to John Lloyd by the creator of the patents at issue in this litigation. Mr. Lloyd is unsure, but he believes that Jay Moskowitz [SCSC's founder] created the chart.

(Dkt. 129-3)

26.     Defendant did not produce any claim charts it relied on in preparing the Second Amended Complaint.

27.     The Court conducted an extensive hearing on Defendants' Motion for Sanctions and RFI's Motion for Summary Judgment on October 18, 2023.

28.     During the hearing, Plaintiff could not explain any pre-suit patent claim charts it had created, analyzed, reviewed, or relied on before filing the Second Amended Complaint.

29.     Plaintiff's counsel did not prepare any written patent claim analysis before filing the Second Amended Complaint.

30.     Plaintiff's counsel could not identify a single patent claim that was supposedly infringed at the Motion for Sanctions hearing.

31.     Plaintiff's counsel could not identify a single patent claim number at the Motion for Sanctions hearing.

32.     Plaintiff could not identify any specific analysis of any specific claim or product.

33.     Plaintiff's counsel admitted he did not look at every element of a claim before suing on a patent.

- 16 -

34.     Plaintiff's counsel admitted he had not read all of the Rule 11 warning letters.

35.     Instead of identifying any specific patent claims or language Plaintiff believes had been investigated properly, during the Sanctions Hearing, Plaintiff's counsel just thumbed through the patents reading their patent numbers.

36.     During the hearing, Plaintiff tried to terminate The Ticktin Law Group as his attorneys of record.

37.     After the hearing, Mr. Ticktin submitted additional authority to the Court by way of a "Statement to Court Regarding Rule 11 Sanctions Oral Argument," a "Notice of Supplemental Authority," an "Additional Statement to Court Regarding Rule 11 Sanctions Hearing Fact Not Mentioned" and three additional "Notice of Supplemental Authority" filings. (Dkts. 145, 147, 151, 153, 154 & 155)

38.     Through Mr. Ticktin's "Statement to Court Regarding Rule 11 Sanctions Oral Argument," he identified certain bar disciplinary actions that had been taken against him. (Dkt. 145)

39.     Mr. Ticktin's first Notice of Supplemental Authority, (Dkt. 129), identified QPharma, Inc. v. Andrew Jergens Co., 360 F.3d 1295 (Fed. Cir. 2004). Q-Pharma is relied upon in Defendants' Motion for Sanctions (see e.g. [Dkt. 129] at 5) and was extensively relied upon throughout the sanctions hearing. Q-Pharma was available to Mr. Ticktin before he filed his response to the sanctions motion. In Q-Pharma, the plaintiff filed a declaration under oath stating that he and a patent attorney interpreted and analyzed the asserted patent before filing suit, and he further

reviewed the patent's claims, written description, and prosecution history and interpreted the individual claim terms. See Q-Pharma, 360 F.3d at 1301. There, the Court was presented with addressing whether specific arguments as to the scope of certain claim language was too broad. Here, Mr. Ticktin did not conduct any pre-suit investigation.

40.     Through Mr. Ticktin's Additional Statement, (Dkt. 151), he identified additional sanctions that had been entered against him. Mr. Ticktin further argues "the undersigned did a pre-suit claims analysis, and no written report was required." (Id.) Mr. Ticktin did not provide any legal citation for this proposition.

41.     Mr. Ticktin's next Notice of Supplemental Authority, (Dkt. 153), identified Halverson Wood Prods. V. Classified Sys. LLC, 2021 U.S. Dist. LEXIS 133889 (D. Minn. July 19, 2021). Halverson Wood addresses whether sanctions are appropriated based on competing claim constructions. The arguments at issue herein are not claim construction disputes. Halverson Wood was also available to Mr. Ticktin before he filed Plaintiff's response to the Motion for Sanctions, so he was welcome to present an argument in his brief.

42.     Mr. Ticktin's next Notice of Supplemental Authority, (Dkt. 154), identified Polaris PowerLED Techs., LLC v. VIIO, Inc., 2019 U.S. Dist. LEXIS 228627 (C.D. Cal. Aug. 29, 2019), another case that was available to him before filing Plaintiff's response to Defendants' Motion for Sanctions. See [Dkt. 155] In Polaris, the plaintiff conducted "teardown" investigations of the accused product, consulted an electrical engineering expert who engaged in an infringement analysis, and during the

Rule 11 safe harbor refined its infringement position to address claim elements that were lacking. Id.

43.     Mr. Ticktin's final Notice of Supplemental Authority, (Dkt. 155), identified Best Med. Int'l, Inc. v. Accuray, Inc., 2014 U.S. Dist. LEXIS 42764 (W.D. Pa. Mar. 31, 2014). Best Med was available to Mr. Ticktin before he filed Plaintiff's response to the Motion for Sanctions. Best Med addresses a motion to strike infringement contentions and is distinguishable from the issue before the Court.

44.     Mr. Ticktin's notices of supplemental authority further demonstrate that he did not undertake a proper pre-suit investigation.

## III.    LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate where the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)). Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356). A moving party discharges its burden on a motion for summary judgment by showing or

highlighting to the Court that no evidence supports the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted). When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial. Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value."). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it." FED. R. CIV. P. 56(e).

## B. Sanctions

Federal courts may sanction an attorney, a law firm or a party pursuant to one Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, or the court's inherent power. See Chambers v. NASCO, Inc., 501 U.S. 32 (1991). Rule 11 sanctions are proper when a party: (1) files "a pleading or other paper that has no reasonable factual basis"; (2) advances "a legal theory that has no reasonable chance of success under the state of the decisional and statutory law and that cannot be advanced as a reasonable argument to reverse, modify, or extend the law[;]" or (3) files "a motion or pleading for purposes of harassment or delay." See United States v. Milam, 855 F.2d

739, 742 (11th Cir. 1988) (internal quotation marks omitted). The Advisory Committee Note to Rule 11 "reminds courts to avoid using the wisdom of hindsight and to test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." Donaldson v. Clark, 819 F.2d 1551, 1556 (11th Cir. 1987).

Sanctions under § 1927 are proper when: (1) an attorney engages in unreasonable and vexatious conduct; (2) that unreasonable and vexatious conduct has multiplied the proceedings; and (3) the dollar amount of the sanction bears "a financial nexus to the excess proceedings, *i.e.,* the sanction may not exceed the "costs, expenses, and attorneys' fees reasonably incurred because of such conduct." See Amlong & Amlong, P.A. v. Denny's, Inc., 500 F.3d 1230, 1239 (11th Cir. 2007) (internal citation omitted). The Eleventh Circuit has explained that "[a]lthough the attorney's objective conduct is the focus of the analysis, the attorney's subjective state of mind is frequently an important piece of the calculus because a given act is more likely to fall outside the bounds of acceptable conduct and therefore be unreasonabl[e] and vexatious[ ] if it is done with a malicious purpose or intent." Id. at 1241 (internal quotation marks omitted) (alterations in original). Negligent conduct standing alone is insufficient for a finding of bad faith under § 1927. See id. at 1242.

## IV.   CONCLUSIONS OF LAW

### A. Summary Judgment

Plaintiff has pursued four claims: (1) a breach of contract claim; (2) a declaratory relief claim; and (3) two patent claims. (Dkt. 38) Based on the Parties' arguments at

the October 18, 2023 hearing, case law and the aforementioned findings of fact, Defendants are entitled to summary judgment as explained below.

**1.  Breach of Contract**

1.  Global never acquired SCSC's contractual rights to receive SCSC's share of the Daimler royalties and therefore RFI did not breach any agreement by not sharing SCSC's share of the Daimler royalties with Global.

2.  Global's security interest in SCSC does not include SCSC's contractual rights. The Post-Default Consent Agreement between Global and SCSC clearly only transferred identified "Collateral" which was defined as certain identifiable intellectual property. The Post-Default Consent Agreement attached an exhibit that "details all of the assets being transferred to [Global]." The Post-Default Consent Agreement, through its attachment, expressly excludes SCSC's contractual rights from being transferred to Global. Global has no interest in SCSC's contractual right to receive royalties pursuant to the Post-Default Consent Agreement.

3.  RFI has no obligation to pay Global any royalties or share any royalty reports with Global.

4.  The language of the Master License Agreement is clear and does not require further interpretation by the Court. As explicitly stated therein, upon termination of the Master License Agreement by SCSC, RFI obtained a worldwide royalty-free license to SCSC's technology. Any purported rights Global may have acquired to the Asserted Patents under the Post-Default Consent Agreement are subject to RFI's worldwide license.

5.      Because SCSC terminated the Master License Agreement, pursuant to §
10.4(b), RFI has a royalty-free, irrevocable, worldwide license with the right to grant
sublicenses to others to utilize all technical information, improvements and/or
modifications (whether or not the subject of patents or pending patent applications)
developed or invented by or on behalf of [SCSC] and/or its sublicensees,
subcontractors, or agents. RFI's license includes a license to all patents asserted by
Global in this litigation.

6.      "Only parties to a contract can be liable for breach of contract." Am.
Coach Lines of Orlando, Inc. v. N. Am. Bus Indus., Inc., No. 6:09-cv-01999, 2011
WL 653524, at *8 (M.D. Fla. Feb.14, 2011). "A person who is not a party to a contract
may not sue for breach of that contract unless that person is an intended third party
beneficiary of the contract." Trans Marine Tampa, LLC v. Marine Sys., Inc., No. 8:11-
cv-00741, 2012 WL 13105634, at *2 (M.D. Fla. Aug. 28, 2012). Global was not a party
to any contract between RFI and SCSC and was not an intended third-party
beneficiary of any agreement between RFI and SCSC.

To prevail on its breach of contract claim, Plaintiff had to establish (1) the
existence of a valid contract, (2) a material breach of that contract, and (3) damages.
Beck v. Lazard Freres & Co., LLC, 175 F.3d 913, 914 (11th Cir. 1999) ("The elements
of a breach of contract action are (1) a valid contract; (2) a material breach; and (3)
damages."). "A rule of contract law is that one who is not a party to an agreement
cannot enforce its terms against one who is a party. " Lawson v. Life of the S. Ins. Co.,
648 F.3d 1166, 1167 (11th Cir. 2011). A non-party may however enforce the terms of

an agreement if that non-party can show a special condition exists. See Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631 (2009) ("traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel[.]"); Nationwide Mut. Fire Ins. Co. v. Pinnacle Med., Inc., 753 So. 2d 55, 57 (Fla. 2000) ("The right of an assignee to sue for breach of contract to enforce assigned rights predates the Florida Constitution.").

Here, Global Glass' breach of contract claim fails because it never acquired SCSC's contractual rights to receive SCSC's share of the Daimler royalties. The MLA's assignment provision is clear, Global Glass had to "expressly assume in writing the performance of all the terms and conditions" and SCSC had to deliver "an originally signed instrument of such assumption and assignment" "to the non-assigning party within 30 days of the execution of such instrument." Global Glass's actions – purporting to self-assign SCSC's rights to itself and referencing the patents in any acquisition documents from SCSC to Global Glass – fall short of the requisite assignment under the contract. Thus, Global Glass lacks standing to pursue its breach of contract claim. See, e.g., Trans Marine Tampa, LLC v. Marine Sys., Inc., No. 8:11-cv-00741, 2012 WL 13105634, at *2 (M.D. Fla. Aug. 28, 2012) ("Because the Court finds that Plaintiff was not a party to the contract or an intended third party beneficiary to the contract, Plaintiff lacks standing to bring a breach of contract claim. . . ."). Defendants are therefore entitled to summary judgment on Count I.

## 2.  Declaratory Relief

To prevail on a claim for declaratory relief, a plaintiff must establish "[(1)] a bona fide, actual, present practical need for the declaration; [(2)] that the declaration should deal with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts; [(3)] that some immunity, power, privilege or right of the complaining party is dependent upon the facts or the law applicable to the facts; [(4)] that there is some person or persons who have, or reasonably may have an actual, present, adverse and antagonistic interest in the subject matter, either in fact or law; [(5)] that the antagonistic and adverse interests are all before the court by proper process or class representation and that the relief sought is not merely the giving of legal advice by the courts or the answer to questions propounded from curiosity. See May v. Holley, 59 So. 2d 636, 639 (Fla. 1952); see also MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007) (articulating the federal standard that there must be "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality.").

Here, Global Glass asks this Court to determine the Parties' rights under the MLA and the Daimler Royalty Splitting Agreement after the MLA was terminated. If the terms of a contract are unambiguous, "a court cannot entertain evidence contrary to its plain meaning." See Sheen v. Lyon, 485 So. 2d 422, 424 (Fla. 1986). Global Glass specifically alleged Defendants breached the Daimler Royalty Splitting Agreement when they failed to pay Plaintiff royalties and produce Daimler License royalty reports. Because the MLA is the source of SCSC's rights – which Global Glass

contends are its rights – as explained in the Daimler Royalty Splitting Agreement, the Court must look at the MLA to measure the extent of any alleged breach. The MLA's termination provision provides that upon SCSC's termination:

> SCSC will either
>
> (A) sell its business to a third party to make Licensed Products (provided however that [RFI] shall have the right to approve in its sole and absolute discretion any such successor entity if intellectual property rights of [RFI] are needed for such successor entity to operate its business), provided further, however, that such third party can insure the uninterrupted and adequate supply of Licensed Products to all RFI Licensees (as that term is defined in Section 3.4 hereof) and their customers, or, if compliance with all of the conditions described in this Clause (A) of this Section 10.4 are not possible or cease to apply, then
>
> (B) grant to [RFI] a nonexclusive, royalty-free, irrevocable, worldwide license with the right to grant sublicenses to others to utilize all technical information, improvements and/or modifications (whether or not the subject of patents or pending patent applications) developed or invented by or on behalf of [SCSC] and/or its sublicensees, subcontractors, or agents hereunder through the date of such termination or expiration of this Agreement relating to Light Valves, or Licensed Products, and upon such termination or expiration, [SCSC] shall provide [RFI] in reasonable detail complete information regarding such technical information, improvements and/or modifications.

Global Glass specifically argued the "or" separating Light Valves and Licensed Products in section B of the MLA's termination provision above was intended to be read in the disjunctive providing alternative rights. Put another way, Global Glass argued that SCSC and RFI intended for RFI to receive either Light Valves or Licensed Products upon termination of the MLA. The record does not support Global Glass's contention, and this Court finds the termination provision is unambiguous and due to

be given its plain meaning. "Technical Information" as defined in the MLA means "all useful information relating to apparatus, methods, processes, practices, formulas, techniques, procedures, patterns, ingredients, designs . . . ." Reading both provisions together, the Court finds SCSC's termination of the MLA caused RFI to be granted a royalty-free, irrevocable, worldwide license with the right to grant sublicenses to others to utilize all technical information, improvements and/or modifications (whether the subject of patents or pending patent applications) developed or invented by or on behalf of [SCSC] and/or its sublicensees, subcontractors or agents. Therefore, RFI's rights upon termination of the MLA include a license to use and the ability to sublicense all patents falling within the MLA's definition of Technical Information.

## B. Sanctions

The Federal Circuit has explained the standard for pre-suit investigations in the patent context: "In the context of patent infringement actions, we have interpreted Rule 11 to require, at a minimum, that an attorney interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging infringement." Q-Pharma, Inc. v. Andrew Jergens Co., 360 F.3d 1295, 1300–01 (Fed. Cir. 2004) (citations omitted). The Federal Circuit has further explained:

> Before filing counterclaims of patent infringement, Rule 11, we think, must be interpreted to require the law firm to, at a bare minimum, apply the claims of each and every patent that is being brought into the lawsuit to an accused device and conclude that there is a reasonable basis for a finding of infringement of at least one claim of each patent so asserted. The presence of an infringement analysis plays the key role in determining the reasonableness of the pre-filing inquiry made in a patent infringement case under Rule 11. Morrison performed neither a

> formal nor an informal analysis of any sort. This cannot be found
> to be a reasonable inquiry for the purpose of filing patent
> infringement claims.
>
> A patent suit can be an expensive proposition. Defending against
> baseless claims of infringement subjects the alleged infringer to
> undue costs—precisely the scenario Rule 11 contemplates.
> Performing a pre-filing assessment of the basis of each
> infringement claim is, therefore, extremely important. In bringing
> a claim of infringement, the patent holder, if challenged, must be
> prepared to demonstrate to both the court and the alleged infringer
> exactly why it believed before filing the claim that it had a
> reasonable chance of proving infringement. Failure to do so
> should ordinarily result in the district court expressing its broad
> discretion in favor of Rule 11 sanctions, at least in the absence of
> a sound excuse or considerable mitigating circumstances.

View Eng'g, Inc. v. Robotic Vision Sys., Inc., 208 F.3d 981, 986 (Fed. Cir. 2000).

The Federal Circuit has provided additional guidance on the pre-suit obligations

of counsel before pursuing a patent infringement claim:

> This court has construed Rule 11, in the context of patent
> infringement actions, to require that an attorney interpret the
> pertinent claims of the patent in issue before filing a complaint
> alleging patent infringement.
>                           * * *
> Although the attorney may consult with the client, Rule 11
> requires that the attorney not rely solely on the client's claim
> interpretation, but instead perform an independent claim analysis.
>                           * * *
> counsel must make a reasonable effort to determine whether the
> accused device satisfies each of the claim limitations.

Antonious v. Spalding & Evenflo Companies, Inc., 275 F.3d 1066, 1072-1074 (Fed.

Cir. 2002) (citations omitted).

The Eleventh Circuit too has explained the standard for Rule 11 sanctions:

> Rule 11 sanctions are proper "(1) when a party files a pleading that
> has no reasonable factual basis; (2) when the party files a pleading

that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) when the party files a pleading in bad faith for an improper purpose." Souran v. Travelers Ins. Co., 982 F.2d 1497, 1506 (11th Cir.1993)

\* \* \*

[T]he court's inquiry focuses only on the merits of the pleading gleaned from facts and law known or available to the attorney at the time of filing.

Jones v. Int'l Riding Helmets, Ltd., 49 F.3d 692, 694 (11th Cir. 1995) (citations omitted) (emphasis in original).

A party may not advance frivolous claims. See e.g. Trump v. Clinton, 2023 WL 333699, at \*11 (S.D. Fla. Jan. 19, 2023) ("The Eleventh Circuit has squarely held that to knowingly advance frivolous claims constitutes bad faith meriting sanctions under a court's inherent powers. Peer [v. Lewis], 606 F.3d [1306], 1316 [(11th Cir. 2010)] (reversing district court's failure to award sanctions under inherent powers based upon Circuit Court's finding that lawyer 'knowingly pursued a frivolous claim, and thus acted in bad faith.')").

Here, the extensive evidence in this record demonstrates there was no claim analysis performed by Plaintiff's Counsel before the Second Amended Complaint was filed. Mr. Ticktin's proffered explanations are legally insufficient but even more problematic, his explanations appear to have been manufactured for the sanctions hearing and in, some instances, the moment. Mr. Ticktin's explanation purportedly started with his having called a friend to advise on patent issues by leaning on the K&L Gates firm, shifting later to his having some patent experience, only and finally, Mr. Ticktin admitted that this actually is his first patent case as the lead attorney, though

he has some scientific background. Mr. Ticktin further explained he could look at the patents and just know they were infringed. Mr. Ticktin further attempted to argue that the Court forced him assert patent claims, but he then tried to retract that argument. Not one explanation offered by Ticktin rises to the level of what the law requires before a competent attorney files a patent infringement lawsuit. Moreover, Mr. Ticktin did not consult any written claim analyses before filing the Second Amended Complaint.

Based on existing precedent, the Court will impose monetary sanctions against the Ticktin Law Group and Mr. Ticktin personally, but not against Ms. Penalta. The extent of the monetary sanction will be determined by separate order. The Court finds no reasonable investigation or due diligence was undertaken in this case before Mr. Ticktin, as supervising attorney, directed that patent claims be pursued. Moreover, despite being provided a generous amount of time to do so, Plaintiff has been unable to find an attorney to co-sign Mr. Ticktin's assertions or review and competently refile nonfrivolous claims. Thus, Defendants are entitled to **SUMMARY JUDGMENT** on Global Glass's patent claims. See e.g., Eon-Net LP v. Flagstar Bancorp, 653 F.3d 1314, 1329 (Fed. Cir. 2011). To be clear, this Court finds that Plaintiff's patent claims are patently frivolous in light of the unambiguous grant of a nonexclusive, royalty-free, irrevocable, worldwide license to RFI of the subject patents. Any competent patent attorney would have so concluded upon a reasonable and diligent pre-suit investigation. Indeed, a cursory review would have put a competent attorney on notice that the patent claims were meritless.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that:

1.  Defendants' Motion for Summary Judgment, (Dkt. 107), is **GRANTED**.

2. Plaintiff's Motion for Partial Summary Judgment, (Dkt. 109), is **DENIED**.

3. Defendant RFI's Motion for Order to Show Cause, (Dkt. 125), is **DENIED as MOOT**.

4. Defendants' Motion for Sanctions, (Dkt. 129), is **GRANTED as stated herein**.

5. Plaintiff's Objections to Defendants' Proposed Findings of Fact and Conclusions of Law, (Dkt. 161), are **OVERRULED**.

6. Defendants' Motion to Extend Time to Submit Trial Briefs, (Dkt. 133), is **DENIED as MOOT**.

**DONE and ORDERED** at Tampa, Florida this 21st day of February 2024.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record
Any Unrepresented Party

- 31 -